IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WESTERN RADIO SERVICES CO., an
Oregon corporation,                            Civ. No. 05-159-AA
                                                OPINION AND ORDER
            Plaintiff,

       v.

QWEST CORPORATION, a Colorado
Corporation; THE PUBLIC UTILITY
COMMISSION of OREGON; LEE BEYER,
Chairman; RAY BAUM, Commissioner; and
JOHN SAVAGE, Commissioner, in their
official capacities as Commissioners
of the Public Utility Commission
of Oregon,

            Defendants.
_____

Marianne Dugan
Attorney at Law
259 E. 5th Ave., Suite 200-D
Eugene, Oregon 97401
    Attorney for Plaintiff

Gregory B. Monson
Stoel Rives LLP
201 S. Main Street, Suite 1100
Salt Lake City, Utah 84111

Alex M. Duarte
Qwest Corporate Counsel
421 SW Oak Street, Room 810
Portland, Oregon 97204
    Attorneys for defendant Qwest Corporation

John Kroger
Attorney General
Michael T. Weirich
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
    Attorneys for defendants Public Utility Commission, Lee
    Beyer, Ray Baum and John Savage

AIKEN, Chief Judge:

    Before this court is the Opening Brief on Issue Remaining

for Trial ("Opening Brief") of plaintiff Western Radio Services

("Western").  Western asks this court to address the First Cause

of Action in its Complaint, the only issue remaining for this

court to decide on remand.  Western alleges that certain

provisions in the interconnection agreement between Western and

Qwest Corporation ("Qwest") and its approval by defendants Oregon

Public Utility Commission, Lee Beyer, Ray Baum, and John Savage

(collectively the "PUC") violate the Telecommunications Act of

1996, Pub. Law. No. 104-104, 110 Stat. 56 (1996), codified at 47

Page 2 - OPINION AND ORDER

U.S.C. §§ 151-615 (the "Act") and the implementing regulations of the Federal Communications Commission ("FCC").  This court finds in favor of Qwest and the PUC and against Western.

### STATUTORY FRAMEWORK

Providing telephone services requires physically wiring each customer to a network of other customers who also have telephone lines.  US W. Commc'ns, Inc. v. Jennings, 304 F.3d 950, 954 (9th Cir. 2002).  Traditionally, these networks have been owned and operated by a single local utility telephone company, referred to under the Act as the incumbent local exchange carrier ("ILEC").  Id.  For the purpose of encouraging competition in the local telephone service market, the Act was established to, among other things, require ILECs to interconnect their networks with newer local exchange carriers, referred to as "requesting" carriers.  See 47 U.S.C. § 251(c)(2); see also N. Cnty. Commc'n Corp. v. McLeodUSA Telecomm. Serv., Inc., No. CV-09-2063-PHX-GMS, 2010 WL 1779445, at *1 (D. Ariz. 2010).

Title 47 U.S.C. § 251(d)(1) directs the FCC to promulgate regulations implementing the Act's local competition provisions.  "Unless and until an FCC regulation is stayed or overturned by a court of competent jurisdiction, the FCC regulations have the force of law and are binding upon state [public utility commissions] and federal district courts."  AT&T Commc'ns of Cal. v. Pac. Bell, No. C 97-0080 SI, 1998 WL 246652, at *2 (N.D. Cal.

1998) (citing Anderson Bros. Ford v. Valencia, 452 U.S. 205, 219-20 (1981)).  The FCC implements the statute's local competition provisions through a series of regulations and orders.  See AT&T Corp. v. FCC, 220 F.3d 607, 612-13 (D.C. Cir. 2000).

Title 47 C.F.R. § 51.5 defines interconnection as "the linking of two networks for the mutual exchange of traffic." Interconnection provides a way for a requesting carrier's customers to reach an ILEC's customers and vice versa.  See Pac. Bell Tel. Co. v. Cal. Pub. Util. Comm'n, 597 F.3d 958, 965-66, (9th Cir. 2010).  If a carrier requests interconnection, the requesting carrier and the ILEC to whom the request is made have a duty to "establish reciprocal compensation arrangements" for interconnection.  47 U.S.C. § 251(b)(5).  In creating an interconnection agreement, both the ILEC and the requesting carrier have a "duty to negotiate in good faith . . . the particular terms and conditions" of such agreements.  47 U.S.C. § 251(c)(1).

The Act sets out a procedural framework for negotiations: A requesting carrier must first make a request for interconnection to an ILEC, which "may negotiate and enter into a binding agreement with the requesting . . . carrier . . . without regard" to the substantive standards of 47 U.S.C. § 251.  47 U.S.C. § 252(a)(1).  The parties to the negotiation may, if they wish, ask a state public utilities commission "to mediate any differences

arising in the course of the negotiation."  47 U.S.C. §
252(a)(2).  If the parties cannot reach agreement through
voluntary negotiations or mediation, either may "petition a State
commission to arbitrate any open issues."  47 U.S.C. § 252(b)(1).
In resolving the open issues through compulsory arbitration, a
state commission must ensure that its resolution "meet[s] the
requirements of section 251" and may "impos[e] appropriate
conditions" to ensure the requirements of 47 U.S.C. § 251 are
met.  47 U.S.C. § 252(b)(4)(C).

Once an interconnection agreement has been adopted either by
negotiation or after compulsory arbitration, it must "be
submitted for approval" to the state commission, which must
either "approve or reject the agreement."  47 U.S.C. § 252(e)(1).
Finally, the Act provides for judicial review of state commission
actions.  47 U.S.C. § 252(e)(6).

### FACTUAL AND PROCEDURAL BACKGROUND

Western is a licensed Commercial Mobile Radio Service
("CMRS") provider incorporated under the laws of Oregon with its
principle place of business in Bend, Oregon.  It offers wireless
telephone services in Oregon.  It does not, however, have a
certificate of authority to provide wireline services in Oregon
as a "competitive telecommunications service provider," commonly
referred to as a "CLEC."  By contrast, Qwest is an ILEC that has
a certificate of authority to provide wireline services in

Page 5 - OPINION AND ORDER

Oregon.

Western alleges that negotiations under the Act between Qwest's predecessor, US WEST Communications, Inc., and Western began in August 1996.  Negotiations resolved some, but not all, of the issues between the parties and in March 2004, Western filed a petition with the PUC for arbitration pursuant to 47 U.S.C. § 252(b).  In its petition, Western identified five issues remaining for arbitration.  In its response, Qwest identified ten additional issues for arbitration.

The arbitrator issued his decision on September 20, 2004. In his decision, the arbitrator ordered that Qwest's proposed language be adopted as to all but one issue.  Regarding that one issue, the arbitrator prescribed the exact language to be utilized in the interconnection agreement.

The arbitrator also ordered, among other things, that "[w]ithin 30 days of the date of the [state commission's] final order in this proceeding, Qwest and Western shall submit an interconnection agreement consistent with the terms of this decision."  Decl. of Richard Oberdorfer in Supp. of Pl.'s Opening Br., Ex. 1, at 14, July 17, 2009.  Western subsequently filed exceptions to the arbitrator's order.

Despite Western's exceptions, the PUC in Order No. 04-600 adopted the arbitrator's decision in its entirety.  This triggered a statutory requirement for Western, as petitioner, to

prepare a compliant interconnection agreement and serve it on
Qwest within fourteen days of the order.[1]  Western did not do so.
In addition, Western was required to submit a compliant
interconnection agreement to the PUC within thirty days, however,
Western again failed to do so.

On November 10, 2004, Qwest submitted an interconnection
agreement to Western for review. In response, Richard Oberdorfer,
Western's owner, informed Qwest he would be out of town and would
not review the document until he returned.  Despite this, on
November 18, 2004, Qwest timely filed the proposed agreement with
the PUC.  Western did not sign the agreement.

On November 29 and December 1, 2004, Western reviewed
Qwest's proposed interconnection agreement, and found some areas
where it allegedly did not comply with the PUC's order.  Instead
of informing the PUC of its concerns, Western filed an action on
February 3, 2005 with the United States District Court for the
District of Oregon.  Western alleged that the district court had
jurisdiction over its suit pursuant to 47 U.S.C. § 252(e)(6), 42
U.S.C. § 207, and 28 U.S.C. §§ 1331 and 1343(a).

In its Complaint, Western alleged the following causes of
action: (1) the PUC's violation of delegated authority, 47 U.S.C.

---

[1]"Within 14 days after the Commission issues its arbitration
decision, petitioner must prepare an interconnection agreement
complying with the terms of the arbitration decision and serve it
on respondent.  Respondent shall either sign and file the
agreement, or file objections to it, within 10 days of service of
it."  Or. Admin. R. 860-016-0030(12) (2009).

§§ 251, 252; (2) Qwest's failure to negotiate the interconnection agreement in good faith, 47 U.S.C. §§ 251(C), 252(A); (3) violation of 42 U.S.C § 1983, civil rights/due process against the PUC; and (4) violation of 42 U.S.C. § 1983 civil rights/equal protection against the PUC.

The defendants moved to dismiss the complaint for lack of subject-matter jurisdiction and failure to state a claim. See Fed. R. Civ. P. 12(b)(1), (6).  Additionally, the defendants argued the court lacked jurisdiction because the PUC had neither approved nor rejected an interconnection agreement.  Moreover, all defendants argued that the court lacked jurisdiction to consider the "good faith" cause of action because it had not been decided by the PUC.  The PUC also contended that Western's 42 U.S.C § 1983 causes of action were barred by the Eleventh Amendment and by absolute and qualified immunity.

This court, in an opinion and order filed on July 25, 2005, dismissed the entire action for lack of jurisdiction.  Western responded by filing an appeal to the Ninth Circuit Court of Appeals ("Ninth Circuit").

After this court issued its opinion and order, Qwest sought the PUC's approval of the interconnection agreement submitted on November 18, 2004.  On October 10, 2005, the PUC approved the interconnection agreement in Order No. 05-1075, Docket ARB 537.[2]

---

[2]This opinion refers to both Docket ARB numbers and order numbers.  A Docket ARB number is a number assigned by the state

Page 8 - OPINION AND ORDER

On October 14, 2005, four days after the approval of the
interconnection agreement, Western petitioned the PUC for
arbitration, Docket ARB 706.  In its petition, Western identified
several issues for arbitration, including an allegation that
Qwest failed to negotiate in good faith.  On January 3, 2006,
however, the PUC dismissed Western's petition.

On July 9, 2008, the Ninth Circuit vacated and remanded this
court's opinion dismissing Western's action.  W. Radio Servs. Co.
v. Qwest Corp., 530 F.3d 1186, 1206 (9th Cir. 2008). The Ninth
Circuit held this court had jurisdiction over Western's good
faith claim.  See id.  However, the Ninth Circuit also held as a
prudential matter that prior to filing suit, Western was required
to first present Qwest's alleged failure to negotiate in good
faith to the state commission.  Id. at 1202.  Finally, the Ninth
Circuit instructed this court to inquire whether the PUC had, in
fact, addressed the good faith claim.  Id. at 1203.  If it had,
then this court was to consider whether Western had a cause of
action under 47 U.S.C. § 207 for Qwest's alleged failure to
negotiate in good faith.  Id.  The Ninth Circuit, however, held
that if the PUC had not addressed Western's claim, then
prudential concerns required Western to present its claim first
to the PUC before bringing suit in district court.  Id. at 1202-

commission when it receives a petition for arbitration under the
Act.  The ARB number is analogous to a case number.  An order
number is assigned by the state commission to each order issued
during an arbitration.

04.

Following remand, on November 6, 2008, the defendants moved to dismiss the Second Cause of Action on the ground that Western had not shown that it had presented its good faith negotiation claim to the PUC in Docket ARB 537, or that the PUC had addressed that claim.  Additionally, the defendants moved to dismiss Western's request for jury trial because the matter was before the court on appellate review.  Finally, the PUC moved to dismiss Western's 42 U.S.C. § 1983 claim as scrivener's error.  Following oral argument on April 27, 2009, this court granted the motions to dismiss in an opinion and order filed on May 5, 2009.

Accordingly, the only remaining portion of the Complaint for this court to decide involves the First Cause of Action, which includes the PUC's determinations on disputed provisions in the interconnection agreement.  Pursuant to 47 U.S.C. § 252(e)(6), Western seeks review of these determinations in addition to four new issues. See Pl.'s Opening Br. on Issue Remaining for Trial, July 17, 2009.

## STANDARDS

Federal courts have jurisdiction to consider issues arising from the negotiation of interconnection agreements pursuant to 47 U.S.C. § 252(e)(6).  That section states, "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the

agreement or statement meets the requirements of section 251 of [title 47] and [section 252]."  47 U.S.C. § 252(e)(6).

Courts apply <u>de novo</u> review to questions of law and the arbitrary and capricious standard to questions of fact and mixed questions of fact.  <u>See</u> <u>US W. Commc'ns, Inc. v. Worldcom Tech., Inc.</u>, 31 F. Supp. 2d 819, 822 (D. Or. 1998).  To the extent that the statute requires factual findings to support the state agency's determination, those findings are reviewed for substantial evidence.  <u>MCI Telecomm. v. U.S. W. Commc'ns</u>, 204 F.3d 1262, 1266-67 (9th Cir. 2000) (internal citation omitted).

## DISCUSSION

### I. Issues 1 and 11: Inter-Tandem Traffic and the SPOP Option

Issues 1 and 11 relate to whether Qwest is required to provide Western access to its network.  Specifically, Issue 1 addresses whether Western need only interconnect at one tandem and whether Qwest must transport and terminate traffic from that tandem to other tandems.  Issue 11 addresses whether the Single Point of Presence ("SPOP") Option should be included in the interconnection agreement.  This court addresses both issues in turn.

Regarding Issue 1, Western contends that it should be permitted to interconnect at one of Qwest's access tandem switches in Oregon and that Qwest be required to transport Western's traffic from that access tandem switch to other access tandem switches to connect any customer in the state.  An access

Page 11 - OPINION AND ORDER

tandem switch provides a carrier with access to the network of another carrier.  See, e.g., AT & T Corp. v. Beehive Tel. Co., Inc., No. 2:08CV941, 2010 WL 376668, at *2 (D. Utah 2010).  Qwest does not use its access tandem switches to transport traffic in the way that Western seeks nor is such transport available to other wireless carriers or CLECs.

Pursuant to 47 U.S.C. § 251(c)(2), ILECs have "[t]he duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network--(A) for the transmission and routing of telephone exchange service and exchange access; (B) at any *technically feasible point* within the carrier's network . . . ." (Emphasis added).  Title 47 C.F.R. § 51.305(a)(2)(iii) provides that interconnection at a tandem switch is technically feasible.

Western cites three cases to support its desired interconnection arrangement.  In Jennings, 304 F.3d at 961, the court affirmed the state commission's decision to allow the competing carrier to interconnect at a single point per Local Access and Transport Area ("LATA").[3]  The court's decision in Jennings, however, is distinguishable because the court in that case did not address whether an ILEC was required to transport a requesting carrier's traffic between its access tandem switches.

---

[3]A "LATA" is a contiguous geographic area for the provision and administration of communications service, created by federal consent decrees.  Sw. Bell Tel. Co. v. Pub. Util. Commc'n of Tex., 348 F.3d 482, 485 (5th Cir. 2003).

Page 12 - OPINION AND ORDER

See id.  Rather, it simply held that an ILEC provide interconnection with requesting carrier at any technically feasible point within the carrier's network.  Id.  In MCI Telecommunication Corp. v. Bell Atlantic Pennsylvania, 271 F.3d 491, 517 (3rd Cir. 2001), the court held that a state commission could not require a competing carrier to interconnect at several interconnection points within a single LATA.  The court's holding in MCI, however, is inapposite because it failed to address whether an ILEC was required to provide transport of a requesting carrier's traffic between its access tandem switches.  See id. at 517.  Lastly, in US West Communications v. MFS Intelenet, Inc., 193 F.3d 1112, 1124 (9th Cir. 1999), the court upheld a provision in the interconnection agreement allowing the competing carrier to interconnect at a single tandem switch per LATA.  Like the courts above, the court in MFS simply upheld the statutory requirement that a competing carrier be allowed to interconnect at a tandem switch if technically feasible, and did not hold that an ILEC must transport a requesting carrier's traffic between its access tandem switches.

     Qwest does not deny that interconnection at an access tandem switch is technically feasible under the Act.  Rather, it argues that the Act does not require it to transport Western's traffic between multiple access tandem switches in the way that Western seeks.  Title 47 U.S.C. § 251(c)(2) clearly gives Western the right to deliver all its traffic to any technically feasible

Page 13 - OPINION AND ORDER

point in Qwest's network.  In line with this requirement, the PUC

upheld Western's right to interconnect to any of Qwest's access

tandem switches if technically feasible.  It did, however, refuse

to require Qwest to transport all of Western's local exchange

traffic between its access tandem switches since no provision

under the Act or FCC regulations required Qwest to do so.  In

light of the above, the PUC's order was not arbitrary or

capricious and did not violate the Act or FCC regulations.

Regarding Issue 11, this court agrees with the PUC that the

SPOP Option merely provides Western with the option to use an

alternative interconnection arrangement, namely Type 2

interconnection.  Here, the interconnect agreement provides that

the "SPOP Option . . . is a Type 2 Interconnection trunking

option that allows Western to establish one physical point of

presence in the LATA in Qwest's territory."  Oberdorfer Decl.,

Ex. 3, at 23.  It does not require Western to interconnect

through a Type 2 interconnection arrangement as Western contends.

Furthermore, Type 2 interconnection is also not a unique or

unusual method for requesting carriers to interconnect.  Rather,

it is the most common form of interconnection that other wireless

providers have with Qwest.  In light of the above, the PUC's

decision was not arbitrary and capricious.  In addition, the SPOP

Option is not contrary to any provision within the Act or FCC

regulations.  Accordingly, the PUC's decision to adopt the SPOP

Option was proper.

Page 14 - OPINION AND ORDER

**II.  Issues 2 and 6: Reciprocal Compensation and Local Traffic**

Issue 2 addresses how the interconnection agreement defines
"non-local calls."  The definition of this term determines
whether reciprocal compensation or access charges will apply to a
call.  Western argues that traffic is subject to reciprocal
compensation if the traffic originates and terminates within the
Major Trading Area ("MTA").[4]  Qwest agrees with Western's
contention, but argues that if an interexchange carrier ("IXC")is
involved in handling the call, then access charges apply, not
reciprocal compensation.[5]

Generally, reciprocal compensation agreements require the
carrier on whose network the call originates to bear the cost of
transporting the telecommunications traffic to the carrier on
whose network the call terminates.  <u>See</u> First Report and Order,
<u>In re Implementation of the Local Competition Provisions in the</u>
<u>Telecommunications Act of 1996</u>, 11 FCC Rcd. 15499, 16013 (1996).
The originating network's customer compensates the originating
network, which in turn, compensates the terminating carrier for
completing the call.  <u>Id.</u>  In contrast, "[a]ccess charges were
developed to address a situation in which three carriers --

---

[4]An MTA defines which cell-phone calls are local.  <u>E.g.,</u>
<u>Alma Commc'ns Co. v. Miss. Pub. Serv. Comm'n</u>, 490 F.3d 619, 621
(8th Cir. 2007).

[5]An IXC is a long-distance carrier that provides intrastate
or interstate long-distance communications services.  <u>Iowa</u>
<u>Network Serv., Inc. v. Qwest Corp.</u>, 385 F. Supp. 2d 850, 860
(S.D. Iowa 2005).

Page 15 - OPINION AND ORDER

typically, the originating [carrier], the IXC, and the terminating [carrier] -- collaborate to complete a long-distance call." Id.  In that case, the caller pays the IXC, which in turn pays both the originating and terminating carriers.  See id.

Pursuant to 47 C.F.R. § 51.701(b)(2), telecommunications traffic is subject to reciprocal compensation if "exchanged between a [local exchange carrier] and a [wireless] provider that . . . originates and terminates within the same [MTA]."  By contrast, traffic between an ILEC and a wireless carrier is subject to interstate access charges, not reciprocal compensation, if it is carried by an IXC.  First Report and Order, 11 FCC Rcd. at 16016-17.

Here, under the interconnection agreement, the term "non-local calls" carries a meaning "as defined in FCC First Report and Order . . . ."  Oberdorfer Decl., Ex. 3, at 5.  As noted above, the FCC First Report and Order applies access charges, not reciprocal compensation, when an IXC is involved with the traffic.  Furthermore, the interconnection agreement states, "Reciprocal Compensation does not apply to Non-Local Traffic." Oberdorfer Decl., Ex. 3, at 12.  Under the interconnection agreement, "[n]on-[l]ocal [t]raffic includes, but is not limited to, traffic originated by one Party, carried by an IXC, and terminated by the other Party."  Oberdorfer Decl., Ex. 3, at 12. Accordingly, the interconnection agreement's application of access charges and reciprocal compensation is in line with FCC

Page 16 - OPINION AND ORDER

regulations.

Regarding Issue 6, Western argues the local calling area where reciprocal compensation applies should be the MTA as defined under 47 C.F.R. § 51.701(b)(2), not the area defined under the interconnection agreement. Qwest responds that Western does not understand the agreement because the agreement defines the MTA in the same way as 47 C.F.R. § 51.701(b)(2).

Pursuant to 47 C.F.R. § 51.701, reciprocal compensation applies to "telecommunications traffic exchanged between a [local exchange carrier] and a [wireless] provider that . . . originates and terminates within the same [MTA]. . . ." The MTA service areas "are based on the Rand McNally 1992 Commercial Atlas & Marketing Guide, 123rd Edition, at pages 38-39 . . . ." 47 C.F.R. § 24.202(a).

Here, the interconnection agreement provides that reciprocal compensation applies to "the termination of EAS/Local and Local Calling Area Traffic." Oberdorfer Decl., Ex. 3, at 12. It defines the term "Local Calling Area" as "a geographic area defined by the MTA . . . as defined in . . . [47 C.F.R. § 51.701(b)(2)]." Oberdorfer Decl., Ex. 3, at 4. It also defines "MTA" in nearly identical language provided by the FCC as "a geographic area established in Rand McNally's Commercial Atlas and Marketing Guide and used by the FCC in defining [wireless] license boundaries for [wireless] providers for purposes of Sections 251 and 252 of the Communications Act of 1934 as

Page 17 - OPINION AND ORDER

amended."  Oberdorfer Decl., Ex. 3, at 4.

The interconnection agreement also defines "Extended Area Service (EAS)/Local Traffic" as "traffic that is originated by an end user of one Party and terminates to an end user of the other Party as defined in accordance with Qwest's then current EAS/Local serving areas, as determined by the Commission." Oberdorfer Decl., Ex. 3, at 4.  This language is similar to the language of 47 C.F.R. § 51.701(b)(2), which defines "telecommunication traffic" as "traffic exchanged between a [local exchange carrier] and a [wireless] provider that . . . originates and terminates within the same [MTA] . . . ."

This court agrees with the PUC's conclusion that the interconnection agreement subjects traffic exchanged between the parties within the MTA to reciprocal compensation as required by the FCC.  Furthermore, the PUC found that the language proposed by Qwest has been included in interconnection agreements with similarly situated wireless carriers.  It concluded that changing the language "would only add uncertainty and the possibility of later disagreement."  Oberdorfer Decl., Ex. 2, at 5.  In light of the above, the PUC's decision was not arbitrary and capricious and is consistent with the Act and FCC regulations.

**III. Issues 3 and 12: Interconnection Methods and the Special Request Process**

Issue 3 addresses whether the interconnection agreement must include a provision requiring Qwest to provide interconnection to

Page 18 - OPINION AND ORDER

Western through Type 1 Dual Tone Multi-Frequency ("DTMF") and "dial pulse" signaling.  Issue 12 addresses whether the interconnection agreement should include the "Special Request Process" provision.  This court addresses these two issues in turn.

Regarding Issue 3, Western contends that the statute requires Qwest to provide interconnection via DTMF and dial pulse signaling because it is technically feasible.  Although Qwest admits that interconnection through these signaling methods is technically feasible, it argues that interconnection through DTMF and dial pulse signaling is obsolete and outdated and has been superseded by "Wink Start MF" signaling.  "Wink start MF" is the signaling method that Qwest uses to interconnect with all other carriers.  The unusual situations where Qwest does offer interconnection through DTMF and dial pulse signaling is where (1) the customer was already utilizing them and was "grandfathered" into the service; and (2) the existing facilities providing these types of signaling were already available.

Pursuant to 47 U.S.C. § 251(c)(2)(C), ILECs are required to provide interconnection to requesting carriers "that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection . . . ."  Similarly, the FCC regulations require interconnection "at a level of quality that is equal to that which the [ILEC] provides itself, a

Page 19 - OPINION AND ORDER

subsidiary, an affiliate, or any other party.  At a minimum, this
requires an [ILEC] to design interconnection facilities to meet
the same technical criteria and service standards . . . used
within the [ILEC's] network."  47 C.F.R. § 51.305(a)(3).  The
term "equal in quality" includes the same technical criteria and
service standards that an ILEC interconnects with other carriers.
See Verizon Md. Inc. v. Core Commc'ns, Inc., 631 F. Supp. 2d 690,
700 (D. Md. 2009).  "An [ILEC] that denies a request for
interconnection at a particular point must prove to the state
commission that interconnection at that point is not technically
feasible."  47 C.F.R. § 51.305(e).

    In Verizon, the court concluded that the Act did not require
the ILEC to interconnect with the requesting carrier through
facilities that were of lesser-quality than that which it
interconnected with other carriers.  Verizon, 631 F. Supp. 2d at
700.  In that case, the requesting carrier demanded
interconnection via infrastructure that was of lesser-quality
than that at which other carriers interconnected with the ILEC.
Id. at 698-99.  Interconnection through the lesser-quality
facilities was provided only to retail customers, not other
carriers, and was technically feasible.  See id. at 694, 698.
The court concluded that permitting ILECS to interconnect with
requesting carriers through inferior facilities could stifle
competition by allowing ILECs to refuse interconnection at the
same quality that it provided to itself and other carriers.  See

Page 20 - OPINION AND ORDER

id. at 699-700.

This case is analogous to Verizon.  In both cases, interconnection was available and technically feasible through inferior methods.  In Verizon, interconnection was available through inferior facilities which the ILEC used to interconnect with retail customers and which was technically feasible. Similarly, here, interconnection through obsolete and outdated signaling methods is available in limited situations and is technically feasible.  The court in Verizon concluded that the ILEC was not required to interconnect through inferior facilities because it could stifle competition and conflict with the Act's purpose.  See id. at 699.  This court is persuaded by the court's conclusion in Verizon and finds that allowing Qwest to provide interconnection through obsolete and outdated methods could also stifle competition and go against the purpose of the Act by allowing Qwest to require future competitors to interconnect through methods that are inferior to those that it provides to itself and other carriers.

Moreover, the FCC regulations simply require an ILEC to provide interconnection with a requesting carrier "at any technically feasible point within the [ILEC's] network . . . ." 47 C.F.R. § 51.305(a).  Here, Qwest has not refused Western interconnection at a particular point.  Rather, it is willing to provide Western interconnection through DTMF and "dial pulse" signaling methods if they are available in the areas where

Page 21 - OPINION AND ORDER

Western requests interconnection and if made through the Special Request Process, which is discussed below.  Accordingly, the issue is not whether Western can interconnect with Qwest at a particular point, but rather how it will do so.  The Act and FCC regulations, however, are silent as to whether it requires an ILEC to redesign its network with outdated technology to accommodate a requesting carrier's request or whether it requires the requesting carrier to interconnect through higher-quality technologies the ILEC uses with all other carriers.

Notably, 47 U.S.C. § 251(c) "does not mandate that [ILECs] cater to every desire of every requesting carrier." Iowa Util. Bd. v. FCC, 120 F.3d 753, 813 (8th Cir. 1997).  More important, the Act's purpose is not only "to promote competition," but also "to secure lower prices and higher quality services . . . and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act, Pub. L. No. 104-104, 110 Stat. 56 (1996).  Requiring Qwest to provide interconnection through outdated technologies is contrary to the purpose of the Act because it could stifle competition, result in lower-quality services, and hinder the development of new technologies.

Accordingly, this court agrees with the PUC and declines to require Qwest to cater to Western's every interconnection desire, especially when doing so would conflict with the purpose of the Act.  The PUC's decision here is also proper because it is supported by facts in the record and is consistent with the Act

and FCC regulations.

With regards to Issue 12, the Special Request Process simply establishes the procedure that Western and Qwest must follow regarding special requests. For example, it requires Western to submit qualifying special requests in writing and requires Qwest to, among other things, provide Western with a cost analysis within a certain time frame. The PUC found that this process does not defer final authority to Qwest, as Western contends, or violate any provisions under the Act or FCC regulations. This court agrees.

**IV. Issue 4: Unbundled Network Elements**

Western contends that under the Act, Qwest must provide Western access to its Unbundled Network Elements ("UNEs"), particularly unbundled loops, so that it can transport traffic between its switch and that of Qwest's. Western also contends that the interconnection agreement violates 47 C.F.R. § 51.319, which requires the PUC, not the interconnection agreement, to establish rates, terms, and conditions for access to Qwest's UNEs.

"Unbundling" is the process of breaking apart something into smaller parts. Pac. Bell Tel. Co., 597 F.3d at 962 n.2. Each unbundled part is a "network element." Id. at 961-62. By analogy, unbundling allows a requesting carrier to obtain the unassembled parts of a car (the unbundled elements), which the carrier can recombine itself into a finished car (the finished

Page 23 - OPINION AND ORDER

service).  See, e.g., MCI Telecomm. Corp. v. GTE Nw., Inc., 41 F.
Supp. 2d 1157, 1179 (D. Or. 1999).  In the telecommunications
context, "unbundling" refers to the portions of the ILEC's
network elements that requesting carriers can buy or lease to
serve subscribers.  See Pac. Bell Tel. Co., 597 F.3d at 962 n.2.

Loops qualify as network elements.  See Jennings, 304 F.3d
at 959-60.  They are the wires connecting telephones to switches.
See, e.g., Qwest Corp. v. Pub. Util. Comm'n of Colo., 479 F.3d
1184, 1187 n.1 (10th Cir. 2007).  Switches are the equipment
directing calls to their destinations.  See, e.g., Jennings, 304
F.3d at 959-60.

On February 4, 2005, the FCC released the Order on Remand,
In the Matter of Unbundled Access to Network Elements Review of
the Section 251 Unbundling Obligations of Incumbent Local
Exchange Carriers, 20 FCC Rcd. 2533 (2005).  The Order on Remand
"denie[s] access to UNEs in cases where the requesting carrier
seeks to provide service exclusively in a market that is
sufficiently competitive without the use of unbundling.  In
particular, [the FCC] den[ies] access to UNEs for the exclusive
provision of mobile wireless services and long distance
services."  Id. at 2552.  The FCC reasoned that "competition has
evolved without such access" and it was thereby "unable to
justify imposing the costs of mandatory unbundling to promote
competition" in these two markets.  Id.; see also Verizon Tel.
Co. v. FCC, 570 F.3d 294, 298 (D.C. Cir. 2009) (FCC declined to
Page 24 - OPINION AND ORDER

order unbundling of network elements in the mobile wireless
services markets because that market was sufficiently
competitive).

Here, Western is an exclusive provider of wireless services.
Accordingly, Qwest is not required to provide Western access to
its unbundled UNEs.  Although the FCC had not yet issued the
Order on Remand when the PUC decided this issue, the arbitrator
and PUC noted that there was a large body of case law supporting
Qwest's position.  Moreover, newly promulgated FCC rules have a
retroactive effect on interconnection agreements arbitrated
before the rules were promulgated.  See, e.g., Jennings, 304 F.3d
at 958.  Since Qwest had no obligation to provide Western access
to its UNEs, the PUC had no obligation to establish rates, terms,
and conditions governing this type of access.

Lastly, the interconnection agreement provides that "Qwest
shall provide nondiscriminatory access to the unbundled network
elements (UNEs) and UNE combinations in accordance with
applicable law.  Should Western request provision of appropriate
UNE's, Qwest will provide them in accordance with the terms and
conditions of its current Oregon SGAT through a separate
amendment to this Agreement."  Oberdorfer Decl., Ex. 3, at 30.
An "SGAT," or statements of generally available terms, includes
terms and conditions that an ILEC "generally offers within that
State to comply with the requirements of section 251 of [title
47] and the regulations thereunder and the standards applicable

Page 25 - OPINION AND ORDER

under [section 252]."  47 U.S.C. § 252(f)(1).  "A State

commission may not approve such statement unless such statement

complies with [section 252] and section 251 of [title 47] and the

regulations thereunder."  47 U.S.C. § 252(f)(2).

Here, the PUC reviewed and approved the UNE provision and

Oregon SGAT.  The plain language of the interconnection agreement

requires Qwest to provide UNEs in accordance with the Act and FCC

regulations.  Furthermore, it does not give Qwest the ability to

impose its rates, terms, and conditions on Western.  Accordingly,

this court finds the PUC's decision to adopt the UNE provision

and Oregon SGAT was supported by substantial evidence and

complies with the Act and FCC regulations.

## V. Issue 5: Request for Negotiations

Western also argues that it is entitled to receive

reciprocal compensation from August 12, 1996, which it contends,

is the date it first requested negotiation of an interconnection

agreement with Qwest.  Pursuant to 47 C.F.R. § 51.717(b), a

wireless provider may charge an ILEC the same rates for

terminating telecommunications traffic that the ILEC charged to

the wireless provider from the date the wireless provider

requested the ILEC to negotiate a new agreement until the date

the state commission approved the interconnection agreement.  47

C.F.R. § 51.717 provides the following:

> (a) Any [wireless] provider that operates under an
> arrangement with an incumbent LEC that was established
> before August 8, 1996 and that provides for non-

reciprocal compensation for transport and termination
of telecommunications traffic is entitled to
renegotiate these arrangements with no termination
liability or other contract penalties.
(b) From the date that a [wireless] provider makes a
request under paragraph (a) of this section until a new
agreement has been either arbitrated or negotiated and
has been approved by a state commission, the [wireless]
provider shall be entitled to assess upon the incumbent
LEC the same rates for the transport and termination of
telecommunications traffic that the incumbent LEC
assesses upon the [wireless] provider pursuant to the
pre-existing arrangement.

Here, Western and Qwest's predecessor, US WEST

Communications, Inc., operated under an arrangement, which

applied non-reciprocal compensation for the transportation and

termination of telecommunications traffic and which was

established prior to August 8, 1996.  Western contends that it

submitted a request to Qwest to negotiate its interconnection

agreement on August 12, 1996 through a letter it mailed to Qwest.

This letter, however, was addressed to an attorney who worked

solely in Qwest's Seattle, Washington office, not its Portland,

Oregon office.  Additionally, the person to whom it was mailed

had no authority to negotiate interconnection agreements in

Oregon.  The attorney does not recollect receiving this letter

and has no record of this letter.

Qwest, however, did receive a letter that Western sent on

March 5, 1997.  In this letter, Western stated that it made a

request to negotiate an interconnection agreement with Qwest in

August 1996.  However, no substantive negotiations took place

after the receipt of this letter.  On June 24, 1999, Western

Page 27 - OPINION AND ORDER

filed a petition with the PUC seeking arbitration, but its request was dismissed on August 6, 1999 because it did not contain the required petition and information to initiate arbitration.  Rather than fixing the errors and resubmitting a petition to the PUC to arbitrate, Western waited for over four years before making another request to Qwest to negotiate.  Qwest received that request on October 14, 2003.  The PUC agreed with the arbitrator's conclusion that the "unexplained four-year lapse is the dispositive event; it is conclusive evidence of the abandonment of any reasonable attempt to obtain an interconnection agreement.  Western cannot benefit from its own inaction."  In light of the above, the PUC concluded that Western was entitled to receive reciprocal compensation from October 14, 2003, not August 12, 1996.

Pursuant to 47 U.S.C. § 252(a)(1), an ILEC and a requesting carrier may voluntarily "negotiate and enter into a binding agreement."  To the extent that voluntary negotiations are unsuccessful, any party to the negotiation may petition the state commission to arbitrate open issues "[d]uring the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a request for negotiation . . . ."  47 U.S.C. § 252(b)(1).  If the requesting carrier fails to petition the state commission to arbitrate open issues within this period, then it must submit a new request to the ILEC.  See In the Matter of Armstrong Communications, Inc.

Page 28 - OPINION AND ORDER

Petition for Relief Pursuant to Section 252(E)(5) of the
Telecommunications Act of 1996 and Request for Additional Relief,
13 FCC Rcd. 871, 879 (1998).

Even assuming, _arguendo_, that Western had submitted a
request on August 12, 1996 and Qwest received this request, no
voluntary negotiations took place between the parties.
Furthermore, after the parties were unable to negotiate an
arbitration agreement, Western failed to petition the PUC to
arbitrate the matter within the statutory period as required
under 47 U.S.C. § 252(b).  Similarly, with regards to the March
5, 1997 letter, Western again failed to petition the PUC within
the statutory period.  Congress requires strict compliance to the
statutory deadlines in 47 U.S.C. § 252.  S. Conf. Rep. No. 104-
230, 104th Cong., 2d Sess. 1 § 252 (1996)("[r]equests to the
state to intervene must be made during the 25 day period that
begins 135 days after the [ILEC] received the negotiation
request.").  Accordingly, under the Act and FCC regulations,
Western was required to submit a new request to Qwest after it
failed to petition the PUC within the statutory period following
the March 5, 1997 letter.

Western properly submitted this new request on October 14,
2003.  Unlike the previous requests, Western properly filed an
arbitration request with the PUC within the statutory period.  In
light of the above, the PUC's decision to apply reciprocal
compensation starting from October 14, 2003 was supported by

substantial evidence and was consistent with the Act and FCC regulations.

## VI. Issue 7: Dedicated Transport

Western contends that the interconnection agreement violates the Act by limiting Qwest's obligation to provide dedicated transport service up to fifty miles.  Specifically, Western objects to the following language in the interconnection agreement:

> Qwest will provide [dedicated transport] where facilities are available.  If [dedicated transport] is greater than fifty (50) miles in length, and existing facilities are not available in either Party's network, and the Parties cannot agree as to which Party will provide the facility, the Parties will construct facilities to a mid-point of the span.

Oberdorfer Decl., Ex. 3, at 15.

"Dedicated transport" involves an ILEC's transmission facilities, which the ILEC dedicates to a carrier and which are located (1) between the ILEC's wire centers or switches; or (2) between an ILEC's wire centers or switches and a requesting carrier's switches.  47 C.F.R. § 51.319(e)(1).  A "wire center" is the connecting point for local loops and a carrier's central office."  Qwest Corp. v. Boyle, 589 F.3d 985, 989 (8th Cir. 2009).  "Meet point arrangements (or mid-span meets) . . . are commonly used between neighboring carriers for the mutual exchange of traffic . . . ."  First Report and Order, 11 FCC Rcd. at 15781.

Pursuant to the FCC First Report and Order, "[r]egarding the

distance from an incumbent LEC's premises that an incumbent
should be required to build out facilities for meet point
arrangements, [the FCC] believe[s] that the parties and state
commissions are in a better position than the [FCC] to determine
the appropriate distance that would constitute the required
reasonable accommodation of interconnection." Id. Furthermore,
the meet point arrangement here is reasonable. See Qwest Corp.,
2002 WL 31103656, at *59 (Or. P.U.C. 2002) ("[I]t is reasonable
and consistent with an ILEC's 251(c) obligations to impose a
distance limitation on the ILEC's obligation to build
[interconnection] facilities. Fifty miles appears to be within
such a zone of reasonableness.")

        Here, the interconnection agreement states that Qwest will
provide dedicated transport to Western if facilities are
available within the network. Only in certain circumstances will
the parties construct facilities to a mid-point span, namely
where (1) existing facilities are not available on either
parties' network; (2) the direct transport required by Western
exceeds fifty miles in length; and (3) the parties cannot agree
as to which party will provide the facilities. Western does not
show this court how the PUC's decision to adopt this language was
arbitrary and capricious or how it violates the Act. Moreover,
the FCC deferred discretion to Qwest and the parties to determine
the appropriate distance for meet point arrangements.
Accordingly, the meet point arrangement here is proper.

Page 31 - OPINION AND ORDER

## VII.  Issue 8: Reciprocal Compensation for Analog Loops

Western contends that the reciprocal compensation provisions in the interconnection agreement violate the Act because they allow Qwest, not the PUC, to determine rates for the use of certain interconnection facilities, specifically analog loops. It also argues the PUC's decision does not provide for reciprocal compensation for analog loop interconnection.  Western's argument, however, is without merit.

Pursuant to 47 U.S.C. § 252(c)(2),the state commission shall not consider the terms and conditions for reciprocal compensation to be just and reasonable unless it determines the following:

> (i) such terms and conditions provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier; and (ii) such terms and conditions determine such costs on the basis of a reasonable approximation of the additional costs of terminating such calls.

Furthermore, reciprocal compensation "shall be symmetrical. . . symmetrical rates are rates that a carrier other than an [ILEC] assesses upon an [ILEC] for transport and termination of telecommunications traffic equal to those that the [ILEC] assesses upon the other carrier for the same services."  47 C.F.R. § 51.711(a).  In other words, under the Act's reciprocal compensation requirement, each carrier should recover the costs it incurs.  <u>U.S. W. Commc'ns, Inc. v. Wash. Util. and Transp. Comm'n</u>, 255 F.3d 990, 995 (9th Cir. 2001).

Page 32 - OPINION AND ORDER

Here, the reciprocal compensation provisions provide the following:

> A Party providing two-way dedicated facilities will pay the other Party the rates set forth in Exhibit A less 50%. Qwest will use its Reciprocal Compensation Credit Method of Billing to calculate the rate described above if Qwest is providing the two-way facility to Western based on the following criteria:
> The Reciprocal Compensation Credit for two-way dedicated facility charges provided by Qwest shall be based on the rates listed on Exhibit A for three components: the *Entrance Facility*, Dedicated Transport (Mileage) and Multiplexing. The sum of these charges will be reduced by a factor of 50% (fifty percent) as a credit to reflect that the traffic on these facilities is relatively balanced.

Oberdorfer Decl., Ex. 3, at 16 (emphasis added).

The interconnection agreement defines "'Reciprocal Compensation Credit' . . . as a monetary credit for 2-way wireline to wireless traffic . . . which is originated by a Qwest landline subscriber and terminates to a Wireless Carrier's subscriber . . . ." Oberdorfer Decl., Ex. 3, at 6.

Exhibit A of the interconnection agreement lists the rates of analog facilities under "entrance facilities." "Entrance facilities" are mechanisms that transport traffic between carriers. See, e.g., Mich. Bell Tel. Co. v. Lark, No. 06-11982, 2007 WL 2868633, at *6 n.14 (E.D. Mich. 2007).

As discussed above in Issue 4, this court agreed with the PUC that Qwest is not required to provide Western with access to its unbundled UNEs, including unbundled analog loops. Accordingly, Qwest need not set forth reciprocal compensation for

Page 33 - OPINION AND ORDER

unbundled analog loop interconnection facilities.

However, under the Act, Qwest must provide the rates for reciprocal compensation regarding other analog loop interconnection facilities.  See 47 U.S.C. § 252(c)(2).  Here, Qwest has done so by listing the rates for analog loops, other than unbundled analog loops, under "entrance facilities" in Exhibit A.  Under the interconnection agreement, "entrance facilities" are one of the three components used to calculate reciprocal compensation.

The PUC concluded the interconnection agreement does not grant discretionary authority to Qwest to set rates for two-way interconnection facilities.  The PUC also agreed with the arbitrator's conclusion that "whatever two-way dedicated facilities are properly used to exchange traffic between the parties will be subject to reciprocal compensation . . . [and] the existence of similar language, utilized by numerous wireless carriers throughout Qwest's territory, will further help to guarantee fairness and uniformity in its application." Oberdorfer Decl., Ex. 2, at 5.

This court agrees and finds Qwest's proposed language does not violate the Act or FCC regulations.  Furthermore, the PUC's decision was supported by substantial evidence and was not arbitrary and capricious.  Accordingly, the PUC's decision to adopt these provisions was proper.

Page 34 - OPINION AND ORDER

## VIII. Issues 10 & 12: Mid-Span Meet POI and the Special Request Process

Western contends that the mid-span meet point of interface ("Mid-Span Meet POI") and Special Request Process provisions in the interconnection agreement violate the Act. It contends that these two provisions allow Qwest, rather than the PUC, to determine technical feasibility and the terms and conditions of Mid-Span Meet POIs.

Western cites 47 C.F.R. § 51.321(b), which provides that "[m]eet point interconnection arrangements" are "[t]echnically feasible methods of obtaining interconnection or access to unbundled network elements." It argues under 47 C.F.R. § 51.321(b), Qwest must construct new Mid-Span Meet POI interconnection facilities at Western's request.

Here, the Mid-Span Meet POI provision in the interconnection agreement states the following:

> A Mid-Span Meet POI is a negotiated Point of Interface requiring new construction by Qwest and is limited to the interconnection of facilities between one Party's Switch and the other Party's Switch. The actual physical Point of Interface and facilities used will be subject to negotiations between the Parties. Each Party will be responsible for its portion of the build to the Mid-Span Meet POI. These Mid-Span Meet POIs will consist of facilities used for . . . Type 1 and Type 2 [interconnection]. Requests for negotiations of a Mid-Span Meet POI for Type 1 interconnection will be made through the Special Request Process . . . .

Oberdorfer Decl., Ex. 3, at 21.

The Mid-Span Meet POI provision in the case at bar does not

Page 35 - OPINION AND ORDER

defer any discretionary authority to Qwest to determine technical feasibility or the terms and conditions of Mid-Span Meet POIs. Rather, it requires the parties to negotiate Mid-Span Meet POI arrangements. Moreover, it does not preclude either party from seeking the PUC's assistance in the event that the parties are unable to come to an agreement. As such, contrary to Western's contention, these provisions do not allow one party to unilaterally determine whether a Mid-Span Meet POI is technically feasible or establish its terms and conditions.

As discussed above, this court concluded that the Special Request Process was proper. Accordingly, the PUC's decision to adopt the Mid-Span Meet POI and Special Request Process provisions does not violate the Act or FCC regulations and was not arbitrary or capricious.

## IX. Issue 15 and New Issues: The Template and New Issues

Issue 15 addresses whether the PUC should have adopted the interconnection agreement proposed by Qwest rather than the one proposed by Western to use as the template on which to incorporate its decisions. The PUC agreed with the arbitrator and adopted Qwest's proposed agreement for the following reasons:

> [U]niformity, ease of administration and comparability to other agreements . . . timesaving and an aid in reducing the possibility of committing omissions or errors where questions of interpretation and precedent are involved. The Qwest agreement is structured in a familiar and widely used format, mirroring agreements with other wireless carriers. It is therefore publicly beneficial to utilize the Qwest draft agreement as the template . . . .

Page 36 - OPINION AND ORDER

Oberdorfer Decl., Ex. 1, at 13.

In addition, the PUC in Order No. 04-600 stated that it "reviewed the Arbitrator's Decision . . . [t]he Arbitrator's Decision complies with the requirements of the Act, applicable FCC regulations . . . and should be approved."  Oberdorfer Decl., Ex. 2, at 6.  In light of the above, the PUC did not act arbitrarily or capriciously when it adopted Qwest's proposed agreement given it was the most complete and accurate agreement presented to it and mirrored agreements Qwest had with other wireless carriers.  In addition, the PUC's decision to adopt Qwest's proposed agreement as their template does not violate the Act or FCC regulations.  Accordingly, the PUC's decision regarding this issue was proper.

Lastly, Western contends the PUC exceeded its authority by adopting Qwest's proposed interconnection agreement, which according to Western, includes four provisions the parties did not negotiate.  This court addresses each provision in turn.

The first provision to which Western objects states, "Western shall establish Type 1 trunk groups to at least one Qwest End Office in each of the EAS/Local Calling Areas where Western provides service."  Western argues that Qwest modified the agreement it submitted to the PUC on November 18, 2004 and which the state commission approved on October 10, 2005.  Qwest responds it did not modify the interconnection agreement and that the proposed interconnection agreement it filed with the

Page 37 - OPINION AND ORDER

arbitrator and the one it submitted to the state commission on November 18, 2004 are identical.

Western does not point to any evidence contradicting Qwest's argument.  Furthermore, this provision does not violate any provision under the Act or FCC regulations.  Accordingly, Western's argument lacks merit.

The second provision to which Western objects states, "The effective date of Reciprocal Compensation between the Parties is October 14, 2003."  This provision is in line with the decision of the PUC and this court as discussed in Issue 5.  In light of the above, this provision is appropriate.

Western also objects to the rate list contained in Exhibit A of the interconnection agreement.  It argues that it does not comply with the parties' settlement agreement. Western, however, does not identify with any specificity to which rates it objects. A court reviews "only issues which are argued specifically and distinctly in a party's opening brief . . . [It] will not manufacture arguments . . . and a bare assertion does not preserve a claim . . . . "  E.g., Birdsong v. Apple, Inc., 590 F.3d 955, 959 (9th Cir. 2009) (internal citation omitted).  Furthermore, this court does not find that the rates in Exhibit A violate the Act or FCC regulations.  Accordingly, the PUC's decision to adopt Exhibit A was proper.

Finally, Western objects to the placement of the sentence stating, "Reciprocal Compensation does not apply to Transit

Page 38 - OPINION AND ORDER

Traffic."  Qwest admits that this sentence is placed in different sections of the interconnection agreements it submitted to the arbitrator and the PUC.  It argues, however, that the placement of this provision in the interconnection agreement does not change the meaning of the sentence.

Western does not demonstrate how the placement of this sentence alters its meaning.  Rather, Western argues that the placement of this sentence may have the "possibility" of doing so.  Since the placement of this sentence does not change the sentence's meaning or violate the Act or FCC regulations, the PUC's decision here was also proper.

## CONCLUSION

For the reasons stated above, this court affirms the PUC's decision in Order No. 04-600 and 05-1075.  Western's request for oral argument is unnecessary.  This case is dismissed.

IT IS SO ORDERED.

Dated this  12   day of August, 2010.


                    /s/ Ann Aiken
                    Ann Aiken
            United States District Judge




Page 39 - OPINION AND ORDER